UNDER SEAL

FILED
CHARLOTTE, NC
DEC 1 3 2016
US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 3:16CR312-RJC |
| ) | |
| ) | **BILL OF INDICTMENT** |
| v. ) | |
| ) | Violations: |
| ) | 18 U.S.C. § 1343 |
| **RICHARD WYATT DAVIS, Jr.** ) | 15 U.S.C. §§ 78j(b), 78ff |
| a/k/a Rich Davis ) | 17 C.F.R. § 240.10b-5 |
| ) | 26 U.S.C. § 7201 |

THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

## I. INTRODUCTION

1. From approximately 2005 and continuing through in or about 2016, Defendant RICHARD WYATT DAVIS, Jr., a resident of Mecklenburg County, North Carolina, defrauded more than 100 investors of more than $19 million through two fraudulent investment funds, DCG Commercial Fund I and DCG Real Assets, and other fraudulent investment vehicles. DAVIS purported that these were low risk investments involving real estate, precious metals, and natural resources and touted the investments as a safe alternative to the stock market. DAVIS falsely assured investors that their investments were growing in value. In reality, DAVIS transferred the majority of investor funds to other DAVIS controlled entities and used the majority of investor funds to repay earlier investors, to enrich himself and his family, and to pay for large administrative and overhead expenses that did not increase value for investors.

2. DAVIS's investors frequently rolled over their entire 401K retirement savings into his funds. DAVIS often recruited investors, including numerous unaccredited investors, who were wary of the government and banking systems, such as by recruiting at "prepper" events, and preyed on these investors' fears of traditional financial markets and their trust of someone who shared their religious views.

3. Additionally, for tax years 2009 through 2012, DAVIS transferred more than $5 million of investor funds into bank accounts in his own name and in the names of Richard Davis Enterprises and Davis Financial, Inc. DAVIS used some of these funds, as well as funds directly out of other DAVIS entity accounts to make more than $2 million in personal expenditures, including payments for his and his then wife's personal credit cards, mortgage payments, nannies, a groundskeeper, a personal chef, vehicles, significant cash withdrawals, and payments to family members. However, DAVIS filed false tax returns for 2009 and 2011 which reflected *negative* total income and failed to file individual income tax returns for 2010 and 2012.

1

## II. RELEVANT ENTITIES

4.  DAVIS operated and controlled numerous companies in connection with his fraudulent investments. These companies, together the "DAVIS ENTITIES" included, but were not limited to:

   A.  Davis Financial, Inc. was a North Carolina corporation formed in July 2002 with its principal office in Charlotte, North Carolina. DAVIS was the President and 100% owner of Davis Financial. Davis Financial purported to be a brokerage firm.

   B.  Davis Capital Group, Inc. was a North Carolina corporation formed in April 2004 with its principal office in Cornelius, North Carolina. DAVIS was the President of Davis Capital Group. The purported business of Davis Capital Group was "investments."

   C.  Richard Davis Enterprises, LLC was a North Carolina limited liability company formed in April 2004 with its principal office in Charlotte, North Carolina. DAVIS was the manager and 99% owner of Richard Davis Enterprises. Richard Davis Enterprises purported to be in the business of real estate investment. Davis Financial owned 1% of Richard Davis Enterprises.

   D.  DCG Commercial Fund I, LLC (formerly known as Aegis Asset Backed Funds, LLC; Aegis/DCG Asset Backed Fund, LLC; and DCG Asset Backed Fund, LLC) ("DCG Commercial Fund") was a North Carolina limited liability company formed in September 2007 with its principal office in Charlotte, North Carolina. DAVIS was Chief Executive Officer of DCG Commercial Fund.

   E.  DCG Real Assets, LLC (formerly known as DCG Real Estate Holdings, LLC and DCG Alternatives, LLC) ("DCG Real Assets") was a North Carolina limited liability company formed in June 2007 with its principal office in Charlotte, North Carolina.

   F.  DAVIS utilized additional companies in connection with his investments, including, but not limited to: DCG ABF Management, LLC; DCG Funds Management; DCG PMF, LLC; DCG PMG, LLC; H20, LLC, also known as H2O, LLC; Basalt Exploration, LLC; Integrity Exploration, LLC; Finely Limited, LLC; Huntersville Plaza Phase One, LLC; Huntersville Plaza Phase Two, LLC; North Lake Business Park, LLC; and NLBP Phase One, LLC.

2

## III. FRAUD SCHEME

5. From in or about 2005 and continuing through in or about 2016, DAVIS engaged in a scheme and artifice to defraud by making a series of false and fraudulent representations, omitting material facts, and telling deceptive half-truths, thereby defrauding victims of more than $19 million dollars. DAVIS executed the scheme to defraud by soliciting investments in two investment funds, DCG Commercial Fund and DCG Real Assets, and in connection with additional investments and loans to other DAVIS ENTITIES.

6. In order to induce investments, DAVIS lied about having a background of successful transactions and about his bona fides. For example:

    A. DAVIS falsely stated that he was a Registered Financial Consultant, which he was not.

    B. DAVIS fraudulently inflated his educational background.

    C. DAVIS falsely represented that previous investors in DAVIS ENTITIES' transactions had received an average net internal rate of return of 32%, which they had not.

7. DAVIS generally executed the scheme in the following manner:

    A. DAVIS targeted investors residing in and around Charlotte, North Carolina. DAVIS's clients included professional athletes and individuals who were recruited through DAVIS's church. DAVIS also recruited individuals who were fearful of the stock market and the banking system, such as by speaking at and hosting events for "preppers" and survivalists.

    B. DAVIS falsely led victims to believe that their money would be invested in several projects, including, among other things, real estate and gold mines. In truth and fact, very little victim money was invested.

    C. DAVIS diverted victim money to himself to support his personal lifestyle, which included, among other things, paying personal expenses and withdrawing large amounts of cash.

    D. DAVIS diverted victim money to other victims in a Ponzi fashion to conceal and prolong the scheme, falsely characterizing such payments as earnings or return of capital in order to induce further investments by such victims.

    E. To avoid fulfilling victim withdrawal requests, DAVIS falsely claimed that the victims' money was unavailable because the funds were tied up in investments that had specific maturity periods. However, DAVIS falsely assured the investors that after a "liquid event" there would be funds available for withdrawals.

F.  To conceal the fraud, DAVIS falsely advised victims that the victims needed to invest additional funds in order to secure the return of their original investment.

G.  DAVIS frequently failed to make timely payments necessary for the business of the fund, such as for payment of property taxes or payments to have audits completed.

H.  DAVIS frequently was evasive or failed to respond to inquiries by investors about the status of their investments. DAVIS even threatened to discontinue managing the investments if investors requested too much information.

## DCG COMMERICAL FUND

8.  Between October 2005 and February 2009, DAVIS defrauded approximately 40 investors of investments totaling more than $4 million through DCG Commercial Fund, and its earlier iterations, as set out in paragraphs 6 and 7 above, and by the following manner and means, among others:

A.  DAVIS made false representations to the investors about the nature of the investments.

   i.  For example, DAVIS falsely represented in the Private Placement Memorandum (PPM) that DCG Commercial Fund would invest in "short-term debt investments in issuers located throughout the southeastern United States" that would typically be secured by a first or junior lien on certain assets of the issuer.

   ii.  In reality, most of the investments into DCG Commercial Fund were not utilized to make short-term debt investments. Rather, DAVIS used the investments into DCG Commercial Fund to pay back earlier investors, to transfer funds to other DAVIS ENTITIES, to make personal expenditures, and to satisfy other business expenses, many of which did not relate to the purposes of the fund.

   iii.  DAVIS failed to provide investors with written descriptions of the investments of DCG Commercial Fund despite agreeing to do so in the PPM.

B.  DAVIS made false representations about the accounting procedures of DCG Commercial Fund.

   i.  DAVIS falsely represented in the PPM that the fund would be audited on an annual basis and that audited financial statements would be provided to investors. This did not occur.

   ii.  DAVIS falsely represented in the PPM that investors would be furnished with quarterly unaudited financial reports. This did not regularly occur.

4

iii. In reality, DAVIS failed to maintain accurate records for DCG Commercial Fund to use to determine the outstanding value, if any, held by investors in the fund, and DAVIS failed to have fund assets appraised or independently valued.

iv. DAVIS provided fraudulent updates to the IRA custodian regarding the purported values held by investors. Later, DAVIS failed to update the IRA custodian as to the value of the investments despite promising to do so.

C. DAVIS made false representations to the investors about his fee for the management of DCG Commercial Fund.

i. For example, according to the PPM, the management fee was 1.5% per year to the fund manager for compensation and certain expenses. According to additional information provided by DAVIS, the management fee was suspended for 2008 and 2009.

ii. In reality, DAVIS routinely transferred and used investment funds in excess of the allotted management fee for his personal benefit.

D. DAVIS attempted to lull investors by making false representations to investors that the fund was making money despite lacking the financial information to make such a claim.

i. For example, in June 2009, DAVIS wrote a letter to investors stating that that the fund generated a 4.65% yield in the first quarter of 2009 and was on track for an 18% annual return.

ii. For example, DAVIS told investors by letter in April 2012, that the Fund's interest in properties were sufficient that the properties could be sold for an amount to repay the original loan amount.

iii. For example, DAVIS further attempted to lull the investors by, on March 11, 2013, providing an update on the funds' assets and providing investors with misleading information regarding the funds purported assets. DAVIS fraudulently asserted that the investors held more than $2.6 million in interest in three properties in Huntersville, North Carolina (together, "the Huntersville properties").

E. Despite making representations to some investors that the fund lacked the liquidity to repay them, DAVIS did make repayments to some investors. Of the approximately $4 million invested in the fund, some investors were repaid in full. However, investors with contributions totaling approximately $2.7 million received no repayment.

5

## DCG REAL ASSETS

9. Between December 2008 and February 2015, DAVIS defrauded approximately 60 investors of investments totaling approximately $8.5 million through DCG REAL ASSETS as set out in paragraphs 6 and 7 above, and by the following manner and means, among others:

    A.    DAVIS made false statements and representations about the supposed investments of DCG Real Assets.

        i.    DAVIS falsely promoted DCG Real Assets as an investment that would allow investors to weather and prosper amidst the "national crisis" of rapidly escalating sovereign and personal debt and further represented in the PPM for DCG Real Assets that the fund would invest in real estate, precious metals, and natural resources.

        ii.    However, DAVIS failed to provide a written disclosure of the purported investments of the fund to investors, despite representations in the PPM that he would do so.

        iii.    In reality, DAVIS utilized the investments into DCG Real Assets to pay back earlier investors, to transfer funds to other DAVIS ENTITIES, to make personal expenditures, and to satisfy other business expenses, many of which did not relate to the purposes of the fund.

    B.    DAVIS made false representations about the accounting procedures of DCG Real Assets.

        i.    DAVIS falsely represented to investors that DCG Real Assets was or would be audited by certified public accountants and that members would receive annual audited financial statements.

        ii.    DAVIS falsely represented in the PPM that investors would be furnished with quarterly unaudited financial reports, when this did not regularly occur.

        iii.    In reality, DAVIS failed to maintain accurate records for DCG Real Assets to use to determine the outstanding value, if any, held by investors in the fund, and DAVIS failed to have such assets appraised or independently valued.

        iv.    Although DAVIS failed to maintain accurate records, DAVIS did maintain rudimentary records that showed that the investment funds were not used to generate value for investors or to purchase tangible assets. Instead, most of the investor funds were used to repay earlier investors, to pay for DAVIS's personal lifestyle, to pay for operating expenses of his funds, such as wages and office rent, to make cash withdrawals, and to advertise the fund to new investors.

C.  DAVIS made false representations in the PPM that previous investors in DCG transactions had received an average net internal rate of return of 32%. In reality, past investors, including many investors in the DCG Commercial Fund, had received no return whatsoever on their investments.

D.  DAVIS made false representations to the investors about his fee for the management of DCG Real Assets.

   i.  For example, according to the PPM, the management fee was supposed to be 0.5% per year to the fund manager for compensation and certain expenses. However, DAVIS failed to assess and withdraw this fee according to required procedures, and took compensation well in excess of this allotted amount.

E.  DAVIS falsely represented to some of the investors that the fund would be able to pay monthly distributions. However, DAVIS frequently missed these payments or was delinquent on them. Moreover, DAVIS failed to disclose to other investors that some investors received monthly distributions.

F.  On some occasions, DAVIS made false representations to investors that the fund was making money despite lacking the financial information to make such a claim.

   i.  For example, DAVIS provided the IRA Rollover company that held the investments of numerous investors with account values showing that the investors had realized gains on their investments. On or about January 23, 2014, DAVIS provided the IRA rollover company with a false document showing the initial investment amounts and current value of investments in DCG Real Assets purportedly held by approximately 45 investors.

   ii.  While DAVIS failed to provide consistent updates to investors as to the value of their investments, on occasion DAVIS did provide updates to investors by email and phone. In these updates, DAVIS routinely assured investors that their investments were growing, despite having no basis to do so.

G.  On some occasions, DAVIS attempted to lull investors to believe that their investments were safe. For example, on or about March 22, 2015, DAVIS emailed a video update to investors that fraudulently suggested that the fund held sufficient assets to cover the investments in the fund.

   i.  In the video, DAVIS falsely represented to the investors that the funds' assets were: (1) the Huntersville properties, that were also supposed assets of DCG Commercial Fund; (2) mining claims called AMD North Claim, AMD South Claim, Willow Creek, and Thacker; (3) a water property in Marion, North Carolina, and (4) a property in Grayson, Virginia.

7

ii. DAVIS also failed to inform the investors that in most cases the fund only held partial, if any, ownership of these assets.

iii. DAVIS failed to inform the investors that these assets were further encumbered by various lawsuits.

10. DCG Real Assets – Flow of Funds. For example, DAVIS obtained investments in DCG Real Assets of approximately $380,000, $300,000, $177,500, and $51,000 from victims S.G., S.M., A.K. and B.R., respectively. DAVIS falsely represented to these victims that their investments, which were obtained from the rollover of IRA retirement accounts, would be made into real assets. DAVIS falsely told these investors that their investments had grown in value. However, in reality, DAVIS transferred the investments between multiple bank accounts related to various DAVIS entities and ultimately diverted most of the funds to make payments to earlier investors, to pay for DAVIS's personal expenses, and to pay for other business expenses that would not create value for the investors.

A. Victim S.G. In or about February 2013, DAVIS solicited approximately $380,000 from victim S.G. into DCG Real Assets. Rather than investing the majority of S.G.'s money, DAVIS diverted the money to make payments to earlier investors and to pay for a variety of DAVIS's personal expenditures and other business expenses, including, among other things: (a) payments to earlier investors of approximately $220,000; (b) cash withdrawals or checks to cash of approximately $28,000; (c) payments for DAVIS's personal expenses totaling approximately $37,000; and (d) payments to employees and contractors of various DAVIS ENTITIES totaling approximately $35,000.

B. Victim S.M. In or about July 2011, DAVIS solicited approximately $300,000 from victim S.M. into DCG Real Assets. Rather than investing the majority of S.M.'s money, DAVIS diverted the money to make payments to earlier investors and to pay for a variety of DAVIS's personal expenditures and other business expenses, including, among other things: (a) payments to earlier investors of approximately $120,000; (b) cash withdrawals or checks to cash of approximately $10,000; (c) payments for the benefit of DAVIS's then wife and ex-wife of more than $4,000; and (d) payments to other family members of DAVIS of more than $14,900.

C. Victim A.K. In or about December 2012, DAVIS solicited approximately $177,500 from victim A.K. into DCG Real Assets. Of the total, approximately $100,000 was wired to a law firm relative to a real estate transaction. However, the rest of the money was funneled through numerous accounts of DAVIS ENTITIES and ultimately spent, including: (a) payments for guns of $17,731.98; (b) cash withdrawals or checks to cash of approximately $22,760.00; (c) payments for the benefit of DAVIS's then wife of more than $2,000; (d) payment for a charitable donation of $6,000; and (e) payments to employees and contractors of various DAVIS ENTITIES totaling approximately $6,000.

D.  Victim B.R. In or about January 2014, DAVIS solicited approximately $51,000 from victim B.R. into DCG Real Assets. Rather than investing the majority of B.R.'s money, DAVIS diverted the money to make payments to earlier investors and to pay for a variety of DAVIS's personal expenditures and other business expenses, including, among other things payments to earlier investors of approximately $11,750.

## OTHER INVESTMENTS

11.  DAVIS defrauded investors in additional DAVIS ENTITIES as set out in paragraphs 6 and 7 above, and by the following manner and means, among others:

A.  H20, LLC. DAVIS fraudulently obtained investments or loans totaling approximately $2.3 million associated with H20, LLC, also known as H2O, LLC. However, DAVIS did not use all of the investments made in H20, LLC for water related purposes.

  i.  For example, on or about December 31, 2014, Victim A.S. invested approximately $125,000.00 in funds in H20, LLC. However, the majority of these funds were subsequently transferred to accounts of other DAVIS ENTITIES and a large portion of these funds were not utilized in connection with water properties or a water related investment but were used for, among other things, mining related activities, payments for DAVIS's personal benefit, and payments related to other DAVIS ENTITIES.

B.  Basalt Exploration. DAVIS fraudulently received a $1 million investment in 2014 in Basalt Exploration. DAVIS falsely represented to the investor, Victim K.H., that his investment was to be used solely related to mining. However, the vast majority of those funds were subsequently used by DAVIS, without authorization, to purchase properties associated with H20, LLC, which were then purported to be assets of DCG Real Assets.

## IV. TAX FRAUD

12.  On or about October 19, 2010, DAVIS filed a 2009 U.S. Individual Income Tax Return Form 1040 reporting *negative* total income of $79,312.00. However, during tax year 2009, DAVIS deposited approximately $1,468,508.25 into bank accounts that were used to make personal expenditures, including a personal bank account, an account in the name of Richard Davis Enterprises, and an account in the name of Davis Financial Inc. In 2009, DAVIS made payments totaling at least $680,570.79 for personal expenditures including payments for his home, payments for a vacation home, and payments for the benefit of his then wife.

13.  On or about October 15, 2011, DAVIS attempted to file a 2010 U.S. Individual Income Tax Return Form 1040 with the IRS. This draft tax return reported negative income and showed total taxes owed of $7,694.00. However, the IRS rejected the tax return due to a discrepancy with the tax identification number listed for DAVIS's nanny. Ultimately, DAVIS's tax return preparer mailed DAVIS the tax return so that DAVIS could physically send it into the

IRS. DAVIS failed to file the tax return with the IRS and failed to pay the balance due.

14. DAVIS draft tax return for 2010 reported *negative* total income of $128,962. However, during tax year 2010, DAVIS deposited approximately $1,274,467.92 into bank accounts that were used to make personal expenditures, including a personal bank account, an account in the name of Richard Davis Enterprises, and an account in the name of Davis Financial Inc. In 2010, DAVIS made payments totaling at least $675,216.83 for personal expenditures including payments for his home, payments for a vacation home, payments for a nanny, and payments for the benefit of his then wife.

15. On or about February 28, 2013, DAVIS filed a delinquent 2011 U.S. Individual Income Tax Return Form 1040 reporting *negative* total income of $231,905.00. DAVIS claimed the earned income tax credit on this tax return. However, during tax year 2011, DAVIS deposited approximately $1,279,483.34 into bank accounts that were used to make personal expenditures, including a personal bank account, an account in the name of Richard Davis Enterprises, and an account in the name of Davis Financial Inc. In 2011, DAVIS made payments totaling at least $458,781.42 for personal expenditures including payments for his home, payments for a vacation home, and payments for other personal properties.

16. On or about April 11, 2013, DAVIS filed an extension to file his 2012 U.S. Individual Income Tax Return Form 1040, listing an estimated total tax liability for 2012 of $0. DAVIS failed to file any tax return for 2012 by October 15, 2013 with the IRS as required by law and failed to make any payments to the IRS for 2012. However, during tax year 2012, DAVIS deposited approximately $1,065,551.13 into bank accounts that were used to make personal expenditures, including a personal bank account, an account in the name of Richard Davis Enterprises, and an account in the name of Davis Financial Inc. In 2012, DAVIS made payments totaling at least $361,134.83 for personal expenditures including payments for his home and payments for other personal properties.

17. Despite reporting minimal income to the IRS, DAVIS frequently reported substantial income – and even supposed substantial payment of taxes – on other documentation, such as financial statements submitted to banks and to courts.

    A. For example, DAVIS provided income information on a credit card application in or about August 2009 wherein he claimed that his yearly income was $560,000 from Davis Capital Group.

    B. For example, DAVIS provided a personal financial statement to a bank on or about September 30, 2009 wherein he claimed that his total annual income was approximately $1.3 million and that his total annual expenditures on federal, state, and local taxes were more than $276,000.

    C. For example, DAVIS provided income information on a credit card application in or about February 2010 wherein he claimed that his yearly income was $1,526,500 from Davis Capital Group.

10

D. For example, DAVIS provided income information on a credit card application in or about January 2012 wherein he claimed that his yearly income was $385,000 from Davis Capital Group.

E. For example, DAVIS provided income information to a North Carolina court pursuant to divorce proceedings in or about March 2015 wherein he claimed that his average monthly gross income was $13,000.00 and that he had average monthly deductions from his gross income for federal and state income taxes, Social Security, and Medicare of more than $1,700.00.

11
Case 3:16-cr-00312-RJC-DSC   Document 3   Filed 12/13/16   Page 11 of 17

## COUNT ONE
### (Wire Fraud)

18.	The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

19.	From in or about January 2005 through in or about 2016, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

**RICHARD WYATT DAVIS, JR.,**

with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud, did cause the transmission in interstate commerce, by means of wire communications, certain signals, including among other things, wire transfers of money to and from bank accounts; emails; internet websites; and interstate phone calls for the purposes of executing said scheme and artifice.

All in violation of Title 18, United States Code, Section 1343.

## COUNT TWO
## (Securities Fraud)

20.     The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

21.     From in or about 2007 through in or about 2016 in Mecklenburg County within the Western District of North Carolina and elsewhere, the defendant,

### RICHARD WYATT DAVIS, JR.,

willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: the DCG Commercial Fund investment contracts.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT THREE
### (Securities Fraud)

22. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

23. From in or about 2008 through in or about 2016 in Mecklenburg County within the Western District of North Carolina and elsewhere, the defendant,

### RICHARD WYATT DAVIS, JR.,

willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: the DCG Real Assets investment contracts.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT FOUR
## (Tax Evasion – 2010 Tax Year)

24. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

25. During the calendar year 2010 Defendant **RICHARD WYATT DAVIS, JR.**, a resident of Cornelius, North Carolina, had and received taxable income of at least approximately $675,000.00. Upon that taxable income, there was owing to the United States of America a substantial income tax. Well knowing the foregoing facts, and failing to make an income tax return on or before April 15, 2011, as required by law, to any proper officer of the Internal Revenue Service, and pay to the Internal Revenue Service the income tax, Defendant **RICHARD WYATT DAVIS, JR.**, between in or about January 2010 and in or about November 2011, in the Western District of North Carolina, did willfully attempt to evade and defeat the income tax due and owing by him to the United States of America for the 2010 calendar year by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income; by paying personal expenses out of business bank accounts; by using nominee entities; by handling his affairs to avoid making the records usual in such transactions; by attempting to file a false tax return with the IRS; and by other means.

All in violation of Title 26, United States Code, Section 7201.

## COUNT FIVE
## (Tax Evasion – 2011 Tax Year)

26. The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

27. On or about February 28, 2013, in the Western District of North Carolina, **RICHARD WYATT DAVIS, JR.**, did willfully attempt to evade and defeat a large part of the income tax due and owing by him to the United States of America for the 2011 calendar year, by preparing and causing to be prepared, and by signing and causing to be signed, a false and fraudulent U.S. Individual Income Tax Return, Form 1040, which was filed with the Internal Revenue Service that omitted substantial income; by paying personal expenses out of business bank accounts; by using nominee entities; by handling his affairs to avoid making the records usual in such transactions; and by other means.

All in violation of Title 26, United States Code, Section 7201.

## COUNT SIX
## (Tax Evasion – 2012 Tax Year)

28.     The Grand Jury realleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 17 of the Bill of Indictment, and further alleges that:

29.     During the calendar year 2012 Defendant **RICHARD WYATT DAVIS, JR.**, a resident of Cornelius, North Carolina, had and received taxable income of at least approximately $361,000.00. Upon that taxable income, there was owing to the United States of America a substantial income tax. Well knowing the foregoing facts, and failing to make an income tax return on or before October 15, 2013, as required by law, to any proper officer of the Internal Revenue Service, and pay to the Internal Revenue Service the income tax, Defendant **RICHARD WYATT DAVIS, JR.**, between in or about January 2012 and in or about November 2013, in the Western District of North Carolina, did willfully attempt to evade and defeat the income tax due and owing by him to the United States of America for the 2012 calendar year by concealing and attempting to conceal from all proper officers of the United States of America his true and correct income; by filing a false tax extension listing estimated liability of $0; by paying personal expenses out of business bank accounts; by using nominee entities; by handling his affairs to avoid making the records usual in such transactions; and by other means.

All in violation of Title 26, United States Code, Section 7201.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $19,000,000.00 such amount constituting the proceeds of the violations set forth in this bill of indictment;

b. One Remington 300 Winchester rifle, Serial Number S6744805;

c. One Remington semi-automatic rifle (AR-10 variant), Serial Number 12BA-10973; and

d. One Sig Sauer P238 pistol, Serial Number 27A185007.

A TRUE BILL

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

*[signature]*
JENNY GRUS SUGAR
ASSISTANT UNITED STATES ATTORNEY